**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
BROOKLYN DIVISION**

| | |
|---|---|
| OSAGIE ERHABOR, <br><br> Plaintiff, <br><br> vs. <br><br> EQUIFAX INFORMATION SERVICES, LLC, and TRANS UNION LLC, <br><br> Defendants. | Civil Case No.: 1:25-cv-00466 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

Osagie Erhabor ("Plaintiff" or "Mr. Erhabor") brings this action on an individual basis, against Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") and Trans Union LLC ("Defendant Trans Union" or "Trans Union") (collectively, the "Defendants") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendants' mixing Plaintiff's credit file with another consumer.

**INTRODUCTION**

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendants acknowledge this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7. Congress made the following findings when it enacted the FCRA in 1970:

> (a) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.
> (b) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.
> (c) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.
> (d) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8. Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10. Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

12. A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

13. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

14. "Mixed files" create a false description and representation of a consumer's credit history.

15. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

16. Mixed files are not a new phenomenon. Defendants have been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

17.     More recently, Defendants have been the subject of numerous state attorney general actions relating to its mixed file problem.

18.     For example, in 2015, the New York Attorney General filed charges and settled claims with Defendants over mixed files.[1]  *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC*.

19.     Notwithstanding Defendants' notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

20.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendants sell information pertaining to one consumer in response to the application of the other.

21.     Defendants have been sued thousands of times wherein an allegation was made that Defendants violated the FCRA.  Moreover, Defendants are sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendants mixed a consumer's credit file with that of another consumer.

22.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

23. For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages. Despite the verdict, Defendants continue to mix consumers' credit files with other consumers' credit files.

24. In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendants continue to mix consumers' credit files with other consumers' credit files.

25. In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendants continue to mix consumers' credit files with other consumers' credit files.

26. More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), aff'd in part, vacated in part, rev'd in part sub nom. *Ramirez v. TransUnion, LLC*, 951 F.3d 1008

(9th Cir. 20020). Despite the verdict, Defendants continue to mix consumers' credit files with other consumers' credit files.

27.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).  Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully.  *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

28.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

29.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendants, to review their procedures when a mixed file occurs.

30.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

31.     Plaintiff's claims arise out of the Defendants' blatantly inaccurate credit reporting, wherein Defendant published in a consumer report about Plaintiff the information of another consumer because Defendants mixed Plaintiff's credit files with that of an unrelated consumer.

32. Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

33. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

34. Osagie Erhabor ("Plaintiff" or "Mr. Erhabor") is a natural person residing in Brooklyn, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

35. Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of New York, including within this District. Equifax can be served through its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

36. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

37. Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams, Chicago, Illinois 60661, and is authorized to do business in the State of New York, including within this District. Trans Union can be served through its registered agent, Illinois Corporation Service Company, at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

38. Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

39. The information Defendants collect, maintain, and sell includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans. Defendants also collect consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

40. Defendants collect and maintain such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether Defendants collect and maintain information about them. Not only that, but consumers cannot remove information that Defendants collect and maintain about them from their respective databases. Further, Defendants sell that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Defendants sold.

## JURISDICTION AND VENUE

41. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

43. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

44. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

45. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

46. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

47. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## DEFENDANTS' PROCESSING OF CREDIT INFORMATION

48. Defendants regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

49. These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

50. Defendants collect information from thousands of furnishers.

51. The process by which Defendants receive, sort, and store information is largely electronic.

52. Furnishers report credit information to Defendants through the use of coded tapes that are transmitted to Defendants on a monthly basis through software known as Metro 2.

53. Defendants take credit information reported by furnishers and creates consumer credit files.

54. Defendants maintain credit files on more than 200 million consumers.

55. Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## DEFENDANTS' MIXED FILE PROBLEM

56. Defendants know that different consumers have similar names.

57. Defendants know that different consumers can have similar Social Security numbers.

58. Defendants know that different consumers with similar names can also have similar Social Security numbers.

59. Defendants know that public records often do contain identifying information such as Social Security numbers or dates of birth.

60. Defendants match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

61. Defendants accomplish this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

62. From time to time, Defendants' matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

63. Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

64. Despite Defendants' long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendants containing information belonging to another consumer.

65. A mixed or merged credit file is the result of Defendants' inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

66. There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendants to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

67. The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendants.

68. A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendants.

69. Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

70. Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## FACTUAL ALLEGATIONS

### Plaintiff Applies for a Capital One, N.A. ("Capital One") Credit Card

71. Plaintiff, a green-card holder at the time, was anticipating obtaining his citizenship in or around January 2025. Once Plaintiff obtained his citizenship, he planned on visiting his family and friends in Nigeria.

72. Plaintiff wanted to apply for credit to help cover the cost of his travels to Nigeria. Therefore, On January 6, 2025, Plaintiff completed and submitted a credit card application for a Capital One Credit Card.

73. For Capital One to make a determination on Plaintiff's credit application, it would need to obtain copies of his credit files. Plaintiff provided Capital One with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

74. On January 6, 2025, Defendants sold a credit report about Plaintiff to Capital One in response to Plaintiff's credit application.

## Capital One Denies Plaintiff's Credit Card Application

75. On January 6, 2025, Capital One issued an adverse action notice to Plaintiff. Within that letter, Capital One communicated that it had denied Plaintiff's credit application.

76. Specifically, adverse action notice informed Plaintiff that he did not qualify for the card he applied for based on his credit profile.

77. Plaintiff was shocked and dismayed at the credit denial because Plaintiff had been diligently working towards being a responsible credit user.

## Plaintiff's Mixed Credit File as of January 2025

78. Shocked, worried, and confused, Plaintiff immediately requested a copy of his credit file from Defendant.

79. On or about January 6, 2025, Plaintiff secured a copy of his credit files from Defendants.

80. Upon reviewing the contents of the January 6, 2025, Equifax and Trans Union credit files, Plaintiff was confused by the appearance of adverse account history information that does not belong to Plaintiff at all.

81. Specifically, Defendants were reporting the following account which does not belong to Plaintiff ("Mixed Account"):

    (a)    SYBMC/CBNA
            Partial Account Number: xxxxxxxxxxxx6283
            Date Opened: December 20, 2014
            Type: Credit Card
            Account Status: Charge-Off

82. Furthermore, Defendants were reporting past due notations of up to 180 days as well as charge-off notations in connection with the Mixed Account.

83. Upon information and belief, the Mixed Account was reported by Defendants to Capital One in response to Plaintiff's credit card application.

84. Upon information and belief, Capital One relied on the inaccurate information in Defendants' consumer reports in making its determination to deny Plaintiff's credit card application.

85. By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant Equifax and Defendant Trans Union each failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

86. Upon information and belief, because Defendants continues to mix Plaintiff's credit file with that of the unrelated consumer.

87. Upon information and belief, as a result of Defendants' "mixed file" concerning Plaintiff, Capital One denied Plaintiff credit.

88. At all times pertinent hereto, Defendants were acting by and through their respective agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

89. At all times pertinent hereto, Defendants' conduct, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

90. Defendants are aware of the shortcomings of their procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Defendants' violations of the FCRA are willful.

91. As a result of each of the Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Equifax and Defendant Trans Union)

92. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

93. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

94. On at least one occasion, each of the Defendants prepared patently false consumer reports concerning Plaintiff.

95. Each of the Defendants mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

16

96. Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

97. Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

98. As a result of each of the Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

99. Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

100. Plaintiff is entitled to recover attorneys' fees and costs from each Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: New York,
January 28, 2025

/s/ *David Pinkhasov*
David Pinkhasov, NY # 5925904
CONSUMER ATTORNEYS
68-29 Main Street
Flushing, NY 11367
T: (718) 701-4605
F: (718) 715-1750
E: dpinkhasov@consumerattorneys.com

Meir Rubinov, NY Bar # 6077887
**CONSUMER ATTORNEYS**
68-29 Main Street
Flushing, New York 11367
Telephone: 718-640-8123
F: (718) 715-1750
mrubinov@consumerattorneys.com

*Attorneys for Plaintiff*
*Osagie Erhabor*